In the Matter of the MARRIAGE OF David Scott BERTRAM and Anita Dorene Bertram, and in the Interest of Jesse Reed Bertram and Ryan Jacob Bertram, Children.

No. 06–97–00101–CV.

Court of Appeals of Texas,
Texarkana.

Submitted June 23, 1998.

Decided Oct. 16, 1998.

Jim E. Bullock, G. Ward Beaudry, Winn, Beaudry, Winn, Dallas, for appellant.

Billy Wayne Flanagan, Flanagan & Flanagan, Mount Pleasant, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

David Scott Bertram appeals from a Final Decree of Divorce ending his marriage to Anita Dorene Bertram. David challenges the legal and factual sufficiency of the evidence to support the trial court's findings of fact and conclusions of law on the issues of custody, visitation, child support, and travel expense responsibility.

David contends that the trial court abused its discretion: (1) by appointing Anita as Sole managing conservator because Anita did not rebut the presumption of Joint managing conservatorship and because the evidence did not support her appointment as Sole managing conservator; (2) by not appointing David as Sole managing conservator because he successfully rebutted the presumption of Joint managing conservatorship; (3) by not appointing David and Anita as Joint managing conservators, because neither David nor Anita rebutted the presumption in favor of Joint managing conservatorship; (4) by ordering David to pay child support in an amount which exceeded the percentage of income set out in the statutory guidelines; (5) by deviating from the standard possession order set out in the statutory guidelines and thereby ordering David to pay all costs associated with the children's travel for visitation.

Evidence presented at trial showed that David and Anita Bertram were married on April 11, 1993, in Universal City, Texas. In late 1993, the Bertrams moved to Wisconsin, Anita's home state, where David attended a pre-seminary program at Northwestern Col-

lege. Soon after the move, Anita learned she was pregnant, and she left David and moved in with her parents. The Bertrams later reconciled, and on April 17, 1994, their twin sons were born.

During the next year, David attended college full time and worked full time while Anita stayed home with the children. After David finished his degree, the Bertrams moved to Scroggins, Franklin County, Texas, where David began working for Pittsburg Motors.

In May 1996, Anita and the children returned to Wisconsin. Anita testified that she and David had agreed that she would visit her family in Wisconsin with the understanding that David would follow when he found a job in Wisconsin. David testified that Anita left for a visit and later decided not to return to Texas. David also testified that Anita refused to allow him to visit her and the children and threatened to take the children away if he tried to visit.

On May 28, 1996, David filed his Petition for Divorce and Custody in Franklin County. On June 10, 1996, upon receipt of David's divorce petition, Anita filed for divorce in Wisconsin. In her petition for divorce, Anita stated that she was a six-month resident of Wisconsin. Anita also attempted to obtain a temporary restraining order preventing David's access to her and the children. The Franklin County, Texas, court assumed jurisdiction over the matter, and the Wisconsin court dismissed Anita's divorce action. On June 17, 1996, the court entered temporary orders giving David custody of the children.

Between May 1996 and the time of trial, David made several attempts at reconciliation. David and Anita attended marital counseling. Trial began on November 26, 1996. Two days into testimony, the trial court ordered David and Anita to attend the Bill Gothard Family Conference "in an effort to bring about reconciliation of the marriage."

Trial reconvened on March 17, 1997. The trial court signed the Final Decree of Divorce on May 30, 1997. Findings of Fact and Conclusions of Law were filed. The final decree appointed Anita Sole managing conservator of the children, ordered David to pay $426 per month child support, and ordered David to pay all costs associated with the children's travel between Wisconsin and Texas.

**Conservatorship**

David challenges the legal and factual sufficiency of the trial court's findings regarding conservatorship.

 The trial court's determination of conservatorship is reviewed under an abuse of discretion standard.[1] In a review applying an abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds of error, but are treated as relevant factors in assessing whether the trial court abused its discretion.[2]

The court's primary consideration in determining conservatorship, possession, and access is the best interest of the child.[3] The Family Code does not set out factors to be considered in determining the best interest of children. However, the Texas Supreme Court, in *Holley v. Adams*,[4] has set out the following factors to be considered in deciding the issue:

(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a

1. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Doyle v. Doyle*, 955 S.W.2d 478, 480 (Tex.App.—Austin 1997, no writ).

2. *In re Driver*, 895 S.W.2d 875, 877 (Tex.App.— Texarkana 1995, no writ).

3. Tex. Fam.Code Ann. § 153.002 (Vernon 1996); *Doyle*, 955 S.W.2d at 480.

4. 544 S.W.2d 367 (Tex.1976).

proper one; and (I) any excuse for the acts or omissions of the parent.[5]

The trial court shall consider the qualifications of the parties without regard to their marital status or to the gender of the party or the child in determining which party to appoint as sole managing conservator, whether to appoint joint managing conservators, and the terms and conditions of conservatorship, possession, and access.[6] The trial court may appoint a sole managing conservator or joint managing conservators.[7] In 1995, the Legislature enacted a rebuttable presumption that the appointment of the parents as joint managing conservators is in the best interest of the child.[8]

### Finding of Violent Nature

■ David's first challenge is to the trial court's finding that he "exhibited, by his actions during the marriage, acts of a violent nature in the presence of his wife and children." He argues that this finding is based on Anita's "uncorroborated, vague testimony" and that such testimony is nothing more than bare assertions without any corroborating evidence. A bare assertion without more specific testimony is no more than a mere scintilla of evidence.[9] In the present case, Anita testified to specific instances regarding David's behavior.

Anita testified that David has a violent nature and temper. She testified:

- that David hit things and threw things;
- that, in front of the children, David grabbed her by the arm and shook her, called her profane names, and said he wished he could die and kill himself;
- that, on their honeymoon, David slammed the hotel door open, threw rocks, kicked the wall, hit his head with his hand and cursed the doorman;
- that David yells and curses at her a lot;

- that David cursed at her and her parents when he found out that she was pregnant with twins;
- that David yelled at her and put his fist through a wall behind her head in front of her young nieces.

Anita testified that this behavior occurred throughout their entire marriage.

David testified that he had on more than one occasion started yelling and screaming and hit a wall with his fist and that he did so out of frustration with Anita. He also testified that he had hit his head on a wall. David also admitted to having cursed in the presence of his children.

However, David denied any allegations of abuse. He directs this Court to the Family Code which defines "family violence" as

(1) an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself; or

(2) abuse, as that term is defined by Sections 261.001(1)(C), (E), and (G) by a member of a family or household toward a child of the family or household.[10]

David contends that none of the behavior described by Anita falls within this definition.

David also points to the expert witness testimony of Stephen Finstein. Finstein is a licensed marriage-family therapist who is often appointed by courts to conduct and provide results of social studies in child custody cases. David hired Finstein to conduct a social study evaluating David, using the same standards Finstein uses when appointed by courts. Finstein testified that David is an

5. *Id.* at 372.

6. Tex. Fam.Code Ann. § 153.003 (Vernon 1996); *Doyle*, 955 S.W.2d at 480.

7. Tex. Fam.Code Ann § 153.005(a) (Vernon 1996); *Doyle*, 955 S.W.2d at 480.

8. Tex. Fam.Code Ann. § 153.131(b) (Vernon 1996), *amended by* Act of June 1, 1997, 75th Leg., ch.

1193, § 20, 1997 Tex. Gen. Laws 4602; *Dennis v. Smith*, 962 S.W.2d 67, 68 (Tex.App.—Houston [1st Dist.] 1997, no writ).

9. *Baker v. Baker*, 719 S.W.2d 672, 676 (Tex. App.—Fort Worth 1986, no writ).

10. Tex. Fam.Code Ann. § 71.004 (Vernon Supp. 1998).

emotionally mature individual without "any mental health pathology or concerns in the emotional stability area."

David also hired Waylon Ward, a licensed professional counselor and licensed marriage-family therapist specializing in the areas of anger therapy and fathering, for an evaluation to determine if he had any particular anger problems and whether he would be suitable as a father. Ward testified that David is "emotionally very stable" and exhibits no abnormal behavior in dealing with anger.

David also hired Dr. Thomas Cook, a clinical psychologist practicing in the area of family evaluation. Cook evaluated David using the same methodology that he uses in evaluating court-appointed cases. Cook testified that David was psychologically mature and that he does not have a violent temper.

Several other witnesses testified that Anita's allegations of David's temper were untrue. Ginna Bertram, David's sister-in-law, testified that she has never seen David's temper or seen him get mad or angry or hit anyone. Georgia Lange, a family friend of the Bertrams, testified that David maintains very good control with the children and that she has never seen him lose his temper. David Bertram, David's father, testified that he has never heard David swear in the presence of the children. Nita Bertram, David's mother, testified that David's moral character is beyond reproach, that David does not now and never has had a temper, and that she has never seen David hit things out of anger. Finally, Boyd Bertram, David's brother, testified that he has never seen David act in any way toward the children that would cause him concern regarding David's fitness to be the children's primary custodian.

David also points to a letter left by Anita for David, wherein Anita describes David as a wonderful father, husband, and friend. Anita testified that she left the letter to counter David's reaction of feeling neglected when she left him to visit her family. She stated that she wrote such letters often "in order for me not to have to endure trying to pick him up off the bottom of the barrel."

The trier of fact may believe one witness and disbelieve another or may resolve inconsistencies in the testimony of any one witness.[11] The trial court's finding that David exhibited acts of a violent nature in the presence of his wife and children is supported by the evidence.

### Finding of Anita as Children's Primary Caregiver

■ David also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that Anita had been the children's primary caregiver during the marriage. He argues that the court's finding penalized him for providing for his family. A parent's prior child-rearing participation is a factor considered in determining conservatorship.[12]

From the time the children were born in April 1994 until David was awarded temporary custody in June 1996, Anita stayed home with the children while David worked full time. During the first year of the children's lives, David attended college full time *and* worked full time. After David finished his degree, the Bertrams moved to Texas, where he again worked full time. David and Anita both testified that David participated actively in the children's daily routine and in their emotional, spiritual, and physical development. Both Anita *and David* testified that Anita was the children's primary caregiver up until the time of the temporary order.

The court's finding that Anita was the primary caregiver for the children during the marriage is supported by the evidence.

### Joint Managing Conservatorship Presumption vs. Sole Managing Conservatorship

■ David argues that the evidence presented was insufficient to overcome the presumption in favor of joint managing conservatorship.

11. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Halamka v. Halamka,* 799 S.W.2d 351, 353 (Tex.App.—Texarkana 1990, no writ).

12. TEX. FAM CODE ANN. § 153.134(a)(4) (Vernon 1996).

As stated earlier, the best interest of the child is always the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child, and a rebuttable presumption exists that it is in the best interest of the child to appoint both parents as joint managing conservators. The trial court must consider several factors in weighing the appointment of joint managing conservators.[13] These factors are: benefits to the child, the cooperative decision-making ability of the parents, geographical proximity, the parents' ability to promote a positive relationship with the other parent, the parents' prior child-rearing participation, and any other relevant factor.[14] These factors are reviewed to determine whether the presumption in favor of joint managing conservatorship has been rebutted.[15]

All witnesses testified that the children would benefit from having both parents active in their lives. David, Anita, and other witnesses testified that David and Anita would be able to cooperate and share in making decisions relating to raising the children. However, the testimony from David, Anita, and other witnesses included references to child-rearing decisions, for example, potty training, that the parents could not agree on. Anita also testified that, while she believed that David was an integral part of her *children's* lives, she did not want him as a part of *her* life. This statement is further evidenced by the fact that Anita has not allowed David to come to her apartment in Wisconsin.

The proximity of the parents' residences is an important factor to consider in evaluating joint living arrangements for a child.[16] David testified that the geographical distance between Anita's residence in Wisconsin and his residence in Texas has not presented a problem for them to communicate and to make decisions concerning the children's best interest. However, distance has been found to make decisions such as evaluating schools, after-school activities, health-care providers, and other daily decisions difficult.[17]

David and Anita testified that they believed it was important for the children to have a good relationship with the other parent. Both testified that they have encouraged the children, while in their care, to maintain a close relationship with the other parent.

David and Anita both testified that they were very active in the children's rearing. As noted above, Anita has probably played a more prominent role in the day-to-day lives of the children.

To support his argument that he rebutted the presumption in favor of joint managing conservatorship, David points to the following evidence:

- David and his family are better educated than Anita and her family. David argues that he and his family have a deeper devotion to education than Anita and her family.

- David lives in his parents' large, lakefront home, while Anita lives in an apartment. David argues that his home will better provide for the children's physical comfort and enjoyment.

- David has arranged for the children to be cared for in his home by his mother while he is at work. Though she did place the children in daycare for a short period of time, Anita testified that she, too, has arranged for her children to be cared for in her home by a family member.

David also argues that children need a strong male role model, and that he is their "idol." As noted earlier, the court may not consider the gender of either party or the children in determining which party to appoint as sole managing conservator.[18] David contends that he is more devoted than Anita to the children's moral and spiritual development. Anita, however, belongs to the same faith as

---

13. Tex. Fam.Code Ann. § 153.134 (Vernon 1996).

14. *Id.*

15. *Doyle,* 955 S.W.2d at 480.

16. *Id.* at 481.

17. *Id.*

18. Tex. Fam.Code Ann. § 153.003 (Vernon 1996).

David and she, too, regularly attends church. David argues that he is better able to put the children's needs ahead of his own and that he provides a more stable environment for the children than Anita. There is evidence to support that both David and Anita have sacrificed their own needs for the needs of their children.

■ The trial judge faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record.[19] The trial judge is, therefore, in a better position to analyze the facts, weigh the virtues of the parties, and determine what will be in the best interest of a child.[20]

The evidence was sufficient to support the trial court's findings. Evidence of the geographical proximity of David's and Anita's residences, of the children's primary caretaker throughout their lives, David's and Anita's ability to make decisions together, and David's violent nature was sufficient to rebut the presumption in favor of joint managing conservatorship and to support the finding that Anita should be appointed sole managing conservator of the children. The trial court did not abuse its discretion.

David's points of error regarding conservatorship are overruled.

**Child Support**

David also contends that the trial court erred in its award of child support. The trial court made the following findings with respect to child support.

5. Defendant, David Scott Bertram, was employed by Burgdorf Chevrolet dealership in Pittsburg, Texas.

6. The monthly net resources of the obligor, David Scott Bertram, per month are $2,119.56.

. . . .

8. The percentage applied to the obligor's net resources for child support by the actual order rendered by the court is 25%.

9. The amount of child support if the percentage guidelines are applied to the first $6,000 of the obligor's net resources is $427.50.

■ David first challenges the trial court's finding of fact that he is employed by Burgdorf Chevrolet dealership in Pittsburg, Texas. Scott testified that he was employed by Pittsburg Motor Company of Pittsburg, Texas, and that his boss was Doug Burgdorf, president of Pittsburg Motor Company and a friend of his family. David's pay stubs in evidence show he is employed by Pittsburg Motor Company. However, this error in the trial court's findings does not substantively affect the findings and, therefore, does not require reversal.

■ David also challenges the legal and factual sufficiency of the evidence to support the trial court's findings that his net monthly resources were $2,119.56 and that twenty-five percent of his net resources requires $426 per month in child support. He contends that, because there was no evidence or insufficient evidence to support those findings, the trial court abused its discretion in ordering $426 in monthly child support.

■ A court's child support order will not be disturbed on appeal unless it is shown that the order constituted a clear abuse of the court's discretion.[21] The test is whether the court acted arbitrarily or unreasonably, without reference to any guiding rules and principles.[22] In making this determination, the appellate court must view the evidence in the light most favorable to actions of the trial court and indulge every legal presumption in favor of the judgment.[23] As long as there is some evidence of a substantive and probative

19. *Cuellar v. Flores,* 238 S.W.2d 991, 992 (Tex. Civ.App.—San Antonio 1951, no writ).

20. *Id.*

21. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex. 1990); *Escue v. Escue,* 810 S.W.2d 845, 847 (Tex.App.—Texarkana 1991, no writ).

22. *Powell v. Swanson,* 893 S.W.2d 161, 163 (Tex. App.—Houston [1st Dist.] 1995, no writ) *(citing Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987)).

23. *Powell,* 893 S.W.2d at 163.

character to support the decision, there is no abuse of discretion.[24]

At the first portion of the trial, held November 26, 1996, David testified that his gross income was approximately $25,000. Pay stubs in evidence show that he earned approximately $2,080.00 each month.[25] Family Code statutory guidelines require child support of twenty-five percent for two children.[26] Twenty-five percent of David's net income would result in a monthly payment of $426.55. The trial court awarded temporary support of $426 per month.

The trial was then continued so that David and Anita could attend a marriage seminar. Testimony resumed on March 16, 1997, at which time David testified that his job title had changed and that his method of compensation changed from salary to commission. At the time of trial, David had worked on a commission basis for only five weeks.

David testified that he now draws $350 per week against a quarterly commission check. Pay stubs in evidence show monthly gross income of approximately $1,800. Applying the 1996 tax chart in the Family Code, Section 154.061, David's net monthly income is $1,474.17.[27] Twenty-five percent of this figure is approximately $369. At the conclusion of the trial, the trial court ordered continued child support of $426. The trial court varied from the statutory guidelines by ordering child support based on David's former income instead of his income at the time of the final order of child support.

David testified to an estimate of what his current income level is, but he could not give a set figure for compensation because he had only worked on a commission basis for five weeks. Anita argues that because David was not able to give an accurate figure for his income level, the trial court did not abuse its discretion in establishing permanent child support based on David's former salary.

The trial court may vary from the statutory guidelines under two instances: (1) the evidence presented rebuts the presumption that the application of the guidelines is in the best interest of the children and justifies a variance therefrom,[28] or (2) the trial court determines that the application of the guidelines would be unjust or inappropriate under the circumstances.[29] If the trial court orders child support in an amount which deviates from the statutory guidelines, the court must state the specific reasons for doing so.[30] The trial court's Findings of Fact and Conclusions of Law with respect to its variance from the support guidelines follow.

[Finding of Fact 10]

The specific reasons that the amount of child support per month ordered by the court varies from the amount stated in Subdivision (4) are:

That the final hearing on this divorce began on November 26, 1996 and that at the time of said hearing the Defendant, David Scott Bertram, was working for Burgdorf Chevrolet and earning $2,119.56.

That said hearing was continued until March 16, 1997 to require the parties to attend a seminar in an attempt to see if differences between the parties could be resolved.

That between the initial hearing on November 26, 1996 and the final hearing on March 16, 1997, the Defendant's job title and earnings changed from $2,119.56 monthly to $1,516.00 monthly.

That at the initial hearing the amount of support finally ordered was within the guidelines.

24. *Id.*

25. $25,000 ÷ 12 = $2,087.

26. Tex. Fam.Code Ann. § 154.125 (Vernon 1996). The 1996 tax chart is used because child support was determined in March 1997.

27. Tex. Fam.Code Ann. § 154.061 (Vernon Supp. 1998).

28. Tex. Fam.Code Ann. § 154.123(a) (Vernon 1996).

29. Tex. Fam.Code Ann. § 154.122(b) (Vernon 1996).

30. Tex. Fam.Code Ann. § 154.130(a)(3) (Vernon 1996); *In re Hidalgo,* 938 S.W.2d 492, 498 (Tex. App.—Texarkana 1996, no writ).

. . . .

[Conclusion of Law 2]

That the child support awarded was within the statutory guidelines based on the earnings of the Defendant when said hearing was heard in November 26, 1997.

These findings of facts and conclusions of law indicate that the trial court chose to accept the earlier testimony (monthly earnings of $2,119.56) heard in the trial to establish David Bertram's income and to ignore his later testimony that his job title and earnings had changed. Generally, a fact finder has a right to believe or disbelieve any portion of the testimony. It is the trier of fact who judges the credibility of the witnesses and the weight to be given their testimony, and it may resolve or reconcile conflicts in the testimony, accepting or rejecting such portions thereof as it sees fit.[31] Based upon the finding of facts, the trial judge apparently accepted that there had been a salary change. However, this finding did not compel the trial court to accept Bertram's opinion as to his projected annual income based upon this short interval for income based upon a commission.

Pursuant to Section 154.061(a), gross income, whenever feasible, should first be computed on an annual basis and then should be recalculated to determine average monthly gross income.[32] At the time of the March 17, 1997 hearing, David had been working in his new position with the same company for only five weeks. The pay that he received did not represent his actual income based upon his commissions, but was a draw against that income, and at periodic intervals, David would receive income based upon the commission. He estimated that his future income would be equal to his draw, but that he had hoped to improve. At the time of the hearing, he had two potential deals pending. Because of the nature of commissions, as opposed to a set income, the trial court had a right to conclude that this short work interval paid on a commission basis did not establish any degree of certainty as to David's income and, therefore, determine that this amount was too speculative for the setting of child support. The trial court has discretion to reach such a conclusion even in face of the argument that the other income is no longer the current income. By looking at David's potential, education, and willingness to take this job on a commission basis, the court indicated that it was not willing to use the testimony that this would be a lower paying job when enough specific information had not been compiled over a significant period of time. Therefore, the trial court did not err in setting child support based on David's previous, proven income level.

This point of error is overruled.

**Travel Costs**

 David also contends that the trial court abused its discretion by varying from the standard possession order with respect to travel costs. Section 153.254(a) of the Family Code[33] provides that when a child is less than three years of age, the court shall render an appropriate order under the circumstances for possession of the child. This section suggests that the trial court is not bound by the guidelines when the children are under three years of age. In this case, the children were under three years of age at the time the judgment was entered. Section 153.254(b) provides that, at the same time, the trial court shall render a prospective order to take effect on the child's third birthday, which presumptively shall be the standard possession order.

The judgment in the present case does not speak in terms of a prospective order to take effect after the children's third birthday. But because the order attempts to cover

---

31. *Herbert v. Herbert,* 754 S.W.2d 141, 142, 144 (Tex.1988); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Stanley Stores, Inc. v. Chavana,* 909 S.W.2d 554, 559 (Tex.App.—Corpus Christi 1995, writ denied).

32. Tex. Fam.Code Ann. § 154.061(a) (Vernon 1996 & Supp.1998).

33. Tex. Fam.Code Ann. § 153.254 (Vernon 1996) provides:
 (a) The court shall render an order appropriate under the circumstances for possession of a child less than three years of age.
 (b) The court shall render a prospective order to take effect on the child's third birthday, which presumptively will be the standard possession order.

matters involving attendance at school, which is not applicable at this time, and situations in which the parents reside 100 miles or less apart, which is not the situation at this time, it can be assumed that this order was intended to apply after the children's third birthday. Thus, the presumptive application of the standard possession order should be applied for the time after the children reach their third birthday.

The standard possession order set out in Family Code Section 153.316(3)(B)(ii) states that

The court shall order the following general terms and conditions of possession of a child to apply without regard to the distance between the residence of a parent and the child:

. . . .

(3) the possessory conservator shall be ordered to do one of the following:

(B) the possessory conservator shall return the child to the residence of the managing conservator at the end of each period of possession, *except that the order shall provide* that the possessory conservator shall surrender the child to the managing conservator at the end of each period of possession *at the residence of the possessory conservator* if:

. . . .

(ii) the possessory conservator and managing conservator lived in the same residence at any time during a six-month period preceding the date on which a suit for dissolution of the marriage was filed and *the possessory conservator's county of residence remains the same and the managing conservator's county of residence changes after they no longer live in the same residence,* effective on the date the order is rendered.[34]

Pursuant to the standard possession order, because Anita moved out of the county after she left David, she would be required to provide transportation for the children from David's home back to her home in Wisconsin after his time of possession.

In ordering terms of possession, the trial court may consider, among other things, the circumstances of the managing conservator and of the possessory conservator and any other relevant factor pursuant to Section 153.256.[35]

As part of the possession order, the trial court ordered David to pick up the children at Anita's residence at the beginning of each of his periods of possession and to return the children to Anita's residence after each of his periods of possession. In its findings of fact, the trial court stated that David had access to air transportation that was not available to Anita. Therefore, the trial court, in its conclusions of law, stated that David is "to provide transportation for the children to and from the home of [Anita] due to the accessibility of air transportation to [David] but not available to [Anita]." In effect, the trial court placed the burden on David to pay all expenses associated with the children's travel between Wisconsin and Texas.

David's "accessibility of air transportation" not available to Anita is actually gained through his father. David's father, a commercial pilot with Delta Airlines, testified that he is given four free round trip tickets on Delta each year, which he can use or give away, and that David is eligible for four round trip tickets at discounted rates. These discounts can only be used on a "space available" basis. According to David's father, David's "non-dependent" status moves him behind all Delta Airline employees' flying space available at the same time. He stated that Friday travel is "almost impossible," and Sunday travel is often difficult. Holiday travel on a space available basis "you can just write off all together."

David's father is also a one-third owner of a Beachcraft Barren airplane, which is available to David with some restrictions. Cost to use the private plane is $80 an hour, which, according to David's father's testimony, comes to $800 for a round trip to Osceola, Anita's home. He also stated that travel on the private plane is often limited by cold

---

34. Tex. Fam.Code Ann. § 153.316(3)(B)(ii) (Vernon Supp.1998) (emphasis added).

35. Tex. Fam.Code Ann. § 153.256 (Vernon 1996).

weather because it is a "no ice airplane." Anita testified that temperatures in Wisconsin often remain below freezing for three to four months out of the year. Therefore, use of the private plane is limited to eight or nine months of the year.

Anita testified that she spent $981 per commercial airline round trip ticket for visitation when David had temporary custody of the children. She also testified that she spent approximately $1,000 on gas and rental of a private plane for visitation, about the same David will have to pay for use of his father's plane.

In essence, the only difference between David's access to air transportation as opposed to Anita's is that David *may* have access to four free round trip tickets and four vouchers at discounted fare per year. Even these vouchers, according to Mr. Bertram's testimony, are virtually useless during peak travel times.

The possibility that David may have access to some amount of air transportation through his father cannot be considered a resource for David, unless the donor has legal obligation to provide the transportation.[36] In the present case, the grandfather has no legal obligation to help provide air transportation, and whether or not he is willing to do so is not enforceable by the parties or the court. Furthermore, the amount so provided would not offset the entire obligation under the standard visitation guideline to the extent that it would require David to pay for all of the costs of the transportation. The parties' agreement as to the time of visitation would not necessarily require the parties to also agree upon the expense; however, the failure to do so places the burden on the court in situations that involve such a long distance of travel and the economic situation of the par-

ties. In the interest of the children, the trial court should consider the parties' financial situations to ensure that the travel expenses are not so great that they would prevent the proper support of the children by either party. The court is not required to take the agreement of parties on this matter if the court deems that the cost of the visitation would be in excess of what the parties could afford and, at the same time, properly provide for the children's other needs.

Under the possession agreement, David will have access to the children six times a year (in addition to standard visitation). Under the best circumstances, David will be able to use all of the free travel vouchers available to his father in addition to the discounted fare vouchers resulting in all vouchers being exhausted after two visitations, not including the standard visitation expenses.[37] There was testimony that if David uses his father's private plane for the four remaining visitations, David will have to spend *at least* $6,400 per year on visitation, not including the standard visitation expenses.[38] Under the trial court's order, Anita will not have to share any portion of this cost.

Under Section 153.316(1), the court shall order the managing conservator to surrender possession to the possessory conservator at the managing conservator's residence at the beginning of each period of possession.[39] In the instant case, David would bear the costs of transporting the children from Wisconsin to Dallas. Under Section 153.316(3)(B)(ii), the court shall order the possessory conservator to surrender possession at the end of the period of possession at the possessory conservator's residence. Anita would bear the costs of picking up the children and returning them to Wisconsin. Viewing these

**36.** See *Ikard v. Ikard*, 819 S.W.2d 644 (Tex.App.— El Paso 1991, no writ). This case related to child support, but the same principle is applicable to required expenditures for transportation for visitation.

**37.** Four round trip tickets will be used for each visitation: David will use two round trip tickets, one to pick up the children and bring them back to his home, and one to take the children back and then return home. The children will use two tickets, one round trip ticket each.

**38.** David's father testified that costs will run $800 per round trip. $800 × 2 round trips per visitation (one to pick up the children and one to return the children) = $1,600 × 4 visitations = $6,400.

**39.** Tex Fam.Code Ann § 153.316(1) (Vernon Supp. 1998).

two sections together, the managing conservator and the possessory conservator share the costs of transportation to and from their respective homes. The fact that David has *some* access to air transportation that Anita does not have does not account for the gross disparity that results when he is forced to pay *all* visitation travel costs. Therefore, we hold that the court abused its discretion in ordering David to provide all transportation for visitation.

We find that to order David to pay the entire amount of the travel expenses for the children in light of the guidelines applicable to this situation is an abuse of discretion. We are not holding that some variation from the standard cost of transportation is not justified, but we do hold that the basis for the variation does not justify relieving Anita from all travel expenses associated with the visitation.

Among the relevant factors that can be considered under the terms of visitation is the financial ability of both parties to have sufficient funds for the travel, as well as to provide proper support for the needs of the children. The court should also consider the factor that the possessory conservator can elect whether to exercise his visitation under the terms of visitation set forth in the judgment, but the managing conservator would have no choice under the standard order but to pay half of the travel expenses associated with the visitation. We recognize that balancing all these factors, as well as others presented by the facts, is difficult in this case. But we are compelled to sustain this point of error and remand the matter of visitation to the trial court. Because the travel expenses are an integral part of the visitation, we are remanding the entire portion of the judgment on visitation to the trial court for review.

Therefore, we affirm that part of the trial court's judgment with respect to conservatorship and child support. We sever and reverse the part of the judgment regarding visitation and remand that portion for further review and determination.