

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-292-CV

IN THE INTEREST OF J.M.C., A CHILD

-----------

FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

In three issues, appellant Gabriela Ergun appeals the trial court's denial of retroactive child support, its deviation from the family code's child support guidelines, and its denial of her attorney's fees.  We affirm.

Background Facts

Gabriela met appellee Juan Jose C. through e-mail correspondence after a mutual friend arranged their introduction.[2]  In 2002, Juan visited Gabriela,

---

[1] ..._ See_ Tex. R. App. P. 47.4.

[2] ..._ In some trial court documents and in his brief, appellee refers to himself as "John."  The trial court's judgment refers to him as "Juan Jose," so we will call him "Juan."

who lives in Bucharest, Romania, for about three weeks. Later, during Gabriela's trip to the United States to see Juan, J.M.C. was conceived. Gabriela gave birth to J.M.C. in Romania on July 12, 2003.

Juan learned that Gabriela was pregnant and began providing her with monthly financial assistance in varied amounts beginning in February 2003. In August 2003, Juan executed an affidavit acknowledging his paternity of J.M.C.[3] Later in 2003, Juan traveled to Romania to visit J.M.C. and Gabriela for about two weeks. Juan stopped providing financial support in August 2004. The next time he saw J.M.C. was in 2008.

In February 2008, Gabriela filed a Petition to Adjudicate Parentage, requesting that "appropriate orders be made for support of the child, including retroactive child support"; Juan answered with a general denial and a specific denial of paternity. After the trial court denied Juan's motion to dismiss for an alleged lack of subject matter jurisdiction, the court ordered genetic testing, which revealed that Juan was almost 100% likely to be J.M.C.'s biological father.[4] In November 2008, several months after she had filed her petition,

---

[3] Juan said that he executed the paternity affidavit so that J.M.C. could obtain a passport and so that J.M.C.'s birth certificate could name Juan as J.M.C.'s father.

[4] Juan said that he requested a DNA test because he discovered that he was not the only man in Gabriela's life and that there was a possibility that J.M.C. was not his son. During the trial, Juan admitted that J.M.C. is his son.

2

Gabriela traveled to Texas, bringing J.M.C. with her. Gabriela initially stayed in a hotel, and after being in Texas for ten days, she called Juan on the phone and then visited him several times. Juan invited Gabriela and J.M.C. to stay at his home rather than at the hotel. Gabriela and J.M.C. stayed with Juan approximately two weeks, and during that time, Gabriela, J.M.C., and Juan took a trip to San Antonio to sightsee.

While Gabriela was staying with Juan, they discussed entering into a notarized agreement regarding visitation rights with J.M.C. and child support. But when Gabriela's attorney advised her not to enter into the agreement, Gabriela told Juan that she wanted to incorporate the agreement's terms into a court's order. At that point, Juan became upset, called the police, and asked Gabriela to leave his house, giving her ten minutes to do so. Officers arrived at his house as Gabriela and J.M.C. left.

In February 2009, the trial court held a bench trial on Gabriela's petition.[5] After the trial, the court designated Gabriela and Juan as J.M.C.'s joint managing conservators, giving Gabriela the right to establish J.M.C.'s residence without a geographic restriction. The trial court ordered Juan to pay Gabriela child support of $500 per month, and the court refused Gabriela's

---

[5] ... J.M.C. was five and a half years old at the time of the trial.

request for retroactive child support. Finally, the court required each party to pay his or her own attorney's fees and costs. Gabriela filed notice of this appeal.

## Retroactive Child Support

In her first issue, Gabriela asserts that the trial court erred by refusing to order Juan to pay retroactive child support. A court may order a parent to pay retroactive child support if the parent has not previously been ordered to pay support for the child and was not a party to a suit in which support was ordered. Tex. Fam. Code Ann. § 154.009(a) (Vernon 2008); *Miles v. Peacock*, 229 S.W.3d 384, 389 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In ordering retroactive child support, the trial court must consider the net resources of the obligor during the relevant time period and whether (1) the mother of the child had made any previous attempts to notify the obligor of his paternity or probable paternity, (2) the obligor had knowledge of his paternity or probable paternity, (3) the order of retroactive child support will impose an undue financial hardship on the obligor or the obligor's family, and (4) the obligor has provided actual support or other necessaries before the filing of the action. Tex. Fam. Code Ann. § 154.131(b) (Vernon 2008); *Miles*, 229 S.W.3d at 389.

The trial court has discretion in deciding whether to award retroactive child support. *See* Tex. Fam. Code Ann. § 154.131(a); *Garza v. Blanton*, 55 S.W.3d 708, 709–10 (Tex. App.—Corpus Christi 2001, no pet.); *In re Guthrie*, 45 S.W.3d 719, 727 (Tex. App.—Dallas 2001, pet. denied). Accordingly, we will not reverse the trial court's decision to not award retroactive child support unless the court abused its discretion. *See Garza*, 55 S.W.3d at 710; *Guthrie*, 45 S.W.3d at 727 (citing *In re Gonzalez*, 993 S.W.2d 147, 155 (Tex. App.—San Antonio 1999, no pet.)).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004); *see In re J.H.*, 264 S.W.3d 919, 923 (Tex. App.—Dallas 2008, no pet.). We cannot conclude that a trial court abused its discretion merely because we would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see Low*, 221 S.W.3d at 620; *J.H.*, 164 S.W.3d at 923 (explaining that the "court of appeals may not substitute its judgment for that of the trial court"). An abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support

the trial court's decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *In re B.R.*, No. 04-09-00362-CV, 2010 WL 2105346, at *2 (Tex. App.—San Antonio May 26, 2010, no pet. h.); *In re B.B.R.*, 188 S.W.3d 341, 345 (Tex. App.—Fort Worth 2006, no pet.).

Gabriela contends that the trial court abused its discretion by refusing to order retroactive child support because Juan "had not provided support for the child for the previous five years," he knew about J.M.C. and had acknowledged in 2003 that he was J.M.C's father, he had claimed J.M.C. as a dependent on tax returns,[6] and he would not suffer financial hardship by providing some amount of retroactive support because his monthly income exceeds his monthly expenses.

Juan testified that he had been working for a small company for seven months at the time of the trial and was earning $2,300 (after taxes had been withheld) every two weeks. His written statements recorded his monthly net income at the time of trial as $4,746 and his monthly expenses at $3,357. In 2005, Juan earned between $34,000 and $35,000. Juan's 2006 tax form shows a salary of approximately $37,000. Juan's gross income in 2007 was

_____

[6] Juan listed J.M.C. as a dependent on his 2003 through 2007 income tax statements.

6

$60,208. In 2008, however, he changed jobs, resulting in being unemployed in May and earning approximately $44,000 for the year.

While Juan did not use these resources to give money to Gabriela for J.M.C.'s support for a substantial amount of the time between J.M.C.'s 2003 birth and the trial court's 2009 judgment, from February to November 2003, Juan sent Gabriela $3,700, which does not include more than $300 in Western Union's service charges that he also paid during those months. Starting in December 2003 and ending in August 2004, he allowed Gabriela to withdraw $4,760.17 directly from his bank account. Also, Juan testified that during his stay in Romania in 2003, he provided Gabriela with additional financial assistance of more than $1,000. Juan's payment of some of J.M.C.'s expenses during Gabriela's pregnancy and the early part of J.M.C.'s life could have supported the trial court's refusal to order retroactive child support. *See* Tex. Fam. Code Ann. § 154.131(b)(4); *Garza*, 55 S.W.3d at 711 (upholding the trial court's denial of retroactive child support because the record indicated "that the judge considered the $2,000 given by appellee prior to the birth of the child," and the trial court could have decided "that appellee had already contributed enough money for support"); *Guthrie*, 45 S.W.3d at 729 (holding that a father's voluntary payment of some expenses for the child could have factored into the trial court's decision to deny retroactive child support

7

even though the payment did not equal the amount that would have been due under statutory guidelines); *see also Randolph v. Randolph*, No. 14-04-00180-CV, 2005 WL 2276873, at *2 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (mem. op.) ("[E]ven if the amount of voluntary support was limited, the trial court acted within its discretion if it denied retroactive support because Randy had paid *some* voluntar[y] support.").

Juan did not give Gabriela financial assistance after August 2004. At trial, he asserted two reasons that he stopped giving the support. First, he said that Gabriela refused to bring J.M.C. to the United States despite Juan's sending Gabriela some money to purchase J.M.C.'s visa and allowing her to use his bank card to purchase a plane ticket. Second, he contended that Gabriela failed to give him phone numbers that he could call to confirm that J.M.C. was still living with her. Gabriela, on the other hand, said that Juan did not give her money to buy a plane ticket,[7] and she alleged that Juan stopped giving her financial support because, according to what he told her in a conversation, he was unemployed and the low cost of living in Romania made the amount that he had already provided "enough." Thus, the record contains conflicting

---

[7] Gabriela also said that although Juan sent her $100 to buy the visa, "the plane ticket was very expensive" and she was "afraid to travel . . . from Romania to here with a one-year-old baby."

evidence about why Juan stopped sending money to Gabriela. The trial court might have resolved the conflict in favor of Juan because it specifically anticipated that Gabriela would not cooperate in facilitating future visits between Juan and J.M.C.

The trial court did not make an explicit determination about whether retroactive child support would impose an undue financial hardship on Juan. Gabriela argues that a retroactive child support award would not impose such a hardship because (1) Juan's monthly income exceeds his monthly expenses by approximately $1,400, (2) Juan gained a financial benefit by claiming J.M.C. as a dependent on his tax returns for five years, and (3) in Juan's proposed parenting plan that he submitted at trial, he offered to pay $12,000 in retroactive support. But assuming that Gabriela's argument regarding Juan's lack of undue hardship is correct, the facts described above still comprise at least some evidence of substantive and probative character to support the trial court's denial of retroactive support.[8] *See Butnaru*, 84 S.W.3d at 211; *B.R.*, 2010 WL 2105346, at *2. Thus, we hold that the trial court did not abuse its discretion by refusing to order such support even if we might have ruled

---

[8] Some of the evidence described below, which concerns Gabriela's income and Juan's anticipated travel expenses to see J.M.C., may also support the trial court's decision to not award retroactive support. The trial court did not specify its reasons for denying such support.

9

differently. *See Low*, 221 S.W.3d at 614, 620; *Cire*, 134 S.W.3d at 838–39.

Having concluded that the trial court did not abuse its discretion by refusing to award retroactive child support, we overrule Gabriela's first issue.

Child Support Amount

In her second issue, Gabriela contends that the trial court erred by deviating from statutory guidelines when it ordered Juan to pay child support of $500 per month. *See* Tex. Fam. Code Ann. § 154.125 (Vernon Supp. 2009). As part of this issue, Gabriela argues that the trial court must make findings to deviate from the guidelines. *See id.* § 154.130(a)(3), (b) (Vernon Supp. 2009); *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996). But upon postsubmission abatement of this appeal, the trial court entered fifteen findings of fact that state (among other things) the following:

> 9. The support ordered is outside of guidelines.
>
> . . . .
>
> 11. The cost for Father to travel to Romania for a week for the purpose of visiting with his child is approximately $5,000.
>
> . . . .
>
> 13. The added costs for Father to go to Romania at least once a year and to pay for additional travel expenses when combined with the ordered child support would exceed the child support paid by Father if he were ordered to simply pay guideline support.

14. Father does not [have] sufficient resources to pay guideline child support and still travel to see the child.

The court also entered two conclusions of law related to child support (among six total conclusions):

5. Under [section 154.123(14) of the family code], an additional factor for the Court to consider in determining child support outside of guidelines is the costs [sic] of travel to exercise possession of and access to a child. Child support should not be set at guideline support because of the costs of travel in order for Father to exercise visitation in Romania . . . .

6. The ordered child support is appropriate under Chapter 154, Texas Family Code, after considering the best interest of the child and the costs of Father's travel to exercise possession of the child.

Because the trial court has made the findings that the family code requires when a court deviates from statutory child support guidelines, we overrule appellant's second issue to the extent that it rests on the trial court's failure to make findings.

We review a trial court's decision to order a particular child support amount under the same abuse of discretion standard as a denial of retroactive support. *See In re M.K.R.*, 216 S.W.3d 58, 61 (Tex. App.—Fort Worth 2007, no pet.); *In re P.J.H.*, 25 S.W.3d 402, 405 (Tex. App.—Fort Worth 2000, no pet.); *see also Smith v. Smith*, 143 S.W.3d 206, 218 (Tex. App.—Waco 2004, no pet.) (applying the abuse of discretion standard to a trial court's downward

deviation from child support guidelines).  Thus, "[w]e will not revise the trial court's judgment merely because we consider the amount of the child support award either too high or too low."  *P.J.H.*, 25 S.W.3d at 405.

The amount of child support set by statutory guidelines is "presumed to be reasonable."  Tex. Fam. Code Ann. § 154.122(a) (Vernon 2008). The family code contains a guideline stating that an obligor who has one child should pay child support equal to twenty percent of the obligor's net resources. *Id.* § 154.125(b).  At the time of the trial, Juan's monthly net income was $4,746.  Thus, the family code's guideline would be $949.20 per month (twenty percent of $4,746).  The trial court set his support obligation at $500 per month, which is 10.5% of his net income (or roughly half of the amount supported by the statutory guideline that applies to Juan).

However, "[a] court may determine that the application of the guidelines would be unjust or inappropriate under the circumstances."  Tex. Fam. Code Ann. § 154.122(b).  Thus, the court may "order periodic child support payments in an amount other than that established by the guidelines if the evidence rebuts the presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines." *Id.* § 154.123(a) (Vernon 2008); *In re Marriage of Bertram*, 981 S.W.2d 820, 827 (Tex. App.—Texarkana 1998, no pet.).  To decide whether to vary from

12

the guidelines, a trial court may consider, among other factors, the age and the needs of the child; the ability of the parents to contribute to the support of the child; any financial resources available for the support of the child; the amount of the obligee's net resources; the cost of travel in order to exercise possession of and access to a child; cash flow from any real and personal property and assets; and any other factor "consistent with the best interest of the child, taking into consideration the circumstances of the parents." Tex. Fam. Code Ann. § 154.123(b).

The trial court specifically relied on Juan's expenses to visit J.M.C. as the reason to vary from the family code's guidelines. In the Order Adjudicating Parentage, the trial court required Juan to pay costs to visit J.M.C. in Romania during J.M.C.'s annual spring breaks and to share with Gabriela the annual costs for transporting J.M.C. to the United States for summer visitation with Juan.[9]

---

[9] Specifically, for summer visitation, the trial court ordered the parents to split the cost of J.M.C.'s round-trip ticket from Romania to the United States and to pay the cost of their own tickets to travel with J.M.C. and then back to their respective homes until J.M.C. is old enough to travel with an escort, rather than a parent, on an airplane. In a letter that the trial court sent to the parties to announce its decision, the court stated, "There is no easy solution to a case such as this. I have attempted to equalize the costs for the child between the parties as much as possible."

13

A round-trip ticket between Romania and Texas costs between $2,300 and $2,400 (or, according to Gabriela, between 1,000 and 1,200 euros). Juan submitted a document showing that it would cost him almost $5,000 for travel and lodging for a nine-day trip to Romania (which would cover the length of J.M.C.'s two-week spring break). Thus, for Juan to see J.M.C. on J.M.C.'s spring break and during summer visitation, Juan will have to pay more than $8,000 per year (almost $5,000 for the spring-break trip to Romania, approximately $2,400 for his round-trip ticket to take J.M.C. back to Romania after summer visitation, and approximately $1,200 for his share of J.M.C.'s round-trip ticket for summer visitation). That amount is more than the $5,390.40 annual difference between the support that Juan would have paid under the family code's guidelines and the $500 per month that the trial court ordered him to pay.

But the travel costs cut both ways. Along with Gabriela's responsibility to pay for her share of annual summer visitation costs (which would total more than $3,500 because of her responsibility to pay for her own round-trip ticket and half of J.M.C.'s ticket), the Order Adjudicating Parentage requires her to pay for costs to transport J.M.C. to visit Juan in Texas for the Christmas holidays once every two years. Thus, assuming that Gabriela stays in the United States while J.M.C. visits Juan during the Christmas holidays, Gabriela

14

would be responsible for two round-trip tickets every two years at a cost of more than $4,500. Therefore, in a year in which the trial court's order entitles Juan to possession of J.M.C. during the Christmas holidays, Gabriela will pay at least $8,000 ($3,500 for summer visitation and $4,500 for Christmas visitation) in transportation costs, which exceeds the $6,000 that she will receive that year in child support.[10]

However, the trial court's findings of fact and conclusions of law show that the court was unconvinced that Gabriela would actually pay the visitation costs as ordered. One of the court's findings states, "Mother has been reluctant to cooperate and seems unlikely to fully cooperate in sending or bringing the child to Texas for visitation with Father so that it is likely that Father will have to travel to Romania if he wants to have a relationship with the child." Similarly, one of the court's conclusions states that "[c]hild support should not be set at guideline support because of the costs of travel in order for Father to exercise visitation in Romania *as well as an anticipated lack of cooperation of Mother in facilitating visits with Father and child*." [Emphasis added.]

---

[10] Alternatively, in any year in which Juan is not entitled to possession of J.M.C. during the Christmas holidays, more than half of Juan's $6,000 in child support payments could be spent on Gabriela's share of the costs for summer visitation.

15

The trial court had an evidentiary basis to determine that Gabriela would not cooperate with Juan to allow Juan's access to J.M.C. As we described above, Juan testified that Gabriela previously refused to bring J.M.C. to the United States despite Juan's offer to pay the costs of the trip. Juan also said that Gabriela failed to give him a phone number that he could call to confirm that J.M.C. was still living with her. Although Gabriela's testimony conflicted with Juan's, as part of our abuse of discretion review, we must defer to the trial court's implicit resolution of the conflict. *See In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding) (explaining that a trial court "does not abuse its discretion if it bases its decision on conflicting evidence"); *George v. Jeppeson*, 238 S.W.3d 463, 474 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

If, as the trial court's findings and conclusions seem to indicate, the trial court determined that Juan would be spending money to visit J.M.C. in Romania but Gabriela would not be spending money to allow J.M.C. to visit Juan in the United States, then the trial court could have reasonably accounted for Juan's expenses by reducing the amount of his child support from the amount recommended by the family code's guidelines. Because there is some evidence to support the trial court's deviation from the guidelines based on Juan's travel expenses, we hold that the trial court did not abuse its discretion

16

by ordering Juan to pay only $500 per month in child support.[11] *See* Tex. Fam. Code Ann. § 154.123(b)(14); *Butnaru*, 84 S.W.3d at 211; *B.R.*, 2010 WL 2105346, at *2; *see also In re S.C.S.*, 201 S.W.3d 882, 888–89 (Tex. App.—Eastland 2006, no pet.) (holding that a trial court did not err by reducing child support in a modification suit because the mother and child had moved, which caused the father's increased travel costs). Thus, we overrule Gabriela's second issue.

## Attorney's Fees

In her third issue, Gabriela contends that the trial court erred by refusing to award her attorney's fees. Specifically, she succinctly argues that she is entitled to attorney's fees because Juan "fought jurisdiction and lost; denied paternity; and demanded genetic testing in spite of an earlier acknowledgment of paternity. Under the evidence presented to the trial court, the court abused

---

[11] ... We also note that the trial court could have decided to vary from the family code's guidelines based on Gabriela's financial resources that she could use to support J.M.C. *See* Tex. Fam. Code Ann. § 154.123(b)(2), (5), (15). Although Gabriela initially asserted at trial that she has monthly expenses of $1,380 and a net income of only $600 (after withholding of Romanian taxes), her testimony upon cross-examination showed otherwise. For example, Gabriela had 140,000 euros in the bank from the sale of land that she owned in Romania. The interest from that sale provides Gabriela with almost $1,000 of additional monthly income that she did not report on her income statement. Gabriela also jointly owns, with her mother, another parcel of industrial land that she does not live on and that is also worth approximately 140,000 euros.

17

its discretion in failing to award attorney's fees to [Gabriela]." Gabriela's attorney, Mary Ann Beaty, testified that Gabriela had retained her in 2007 and had paid her close to $7,000 based on more than forty hours that Beaty or her legal assistant had worked on the case. Beaty then described some of the particular acts that she had taken in the case and stated that Gabriela would owe her more money for representation during the trial.

In suits affecting the parent-child relationship, the court may render judgment for reasonable attorney's fees. Tex. Fam. Code Ann. § 106.002(a) (Vernon 2008). The family code gives the trial court discretion on whether to award attorney's fees. *Lenz v. Lenz*, 79 S.W.3d 10, 21 (Tex. 2002); *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996). Thus, we must review the trial court's decision to not award attorney's fees for an abuse of discretion. *B.B.R.*, 188 S.W.3d at 344–45.

The trial court did not specify why it denied Gabriela's request for an award of attorney's fees. We agree with Gabriela that the reasons she offered could support such an award, but we conclude that under the facts detailed above, the trial court did not act beyond any guiding rules or principles—and therefore did not abuse its discretion—by denying the award, especially in light of the trial court's denial of Gabriela's request for retroactive support and its determination that Gabriela is unlikely to comply with the court's order to bring

18

J.M.C. to Texas. *See Low*, 221 S.W.3d at 614, 620; *Cire*, 134 S.W.3d at 838–39. Therefore, we overrule Gabriela's third issue.

## Conclusion

Having overruled all of Gabriela's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: July 22, 2010